UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                    :

ROBERT SUMMA,                   :     07-CV-4668 (ARR)

                     :

           Petitioner,       :     <u>NOT FOR PRINT OR</u>
                     :     <u>ELECTRONIC</u>
    -against-             :     <u>PUBLICATION</u>

                     :

JAMES J. PLESCIA, Superintendent, Washington   :     <u>OPINION AND ORDER</u>
Correctional Facility             :

                     :

           Respondent.     :

                     :
------------------------------------------------------------------ X

ROSS, United States District Judge:

      On November 2, 2007 petitioner *pro se*, Robert Summa, brought the instant action for a

writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in

New York Supreme Court, Richmond County, of one count of Robbery in the Second Degree,

and sentenced to a determinate term of 10 years in prison. As the sole ground for relief,

petitioner argues that he was deprived of a fair trial in violation of his due process rights because

of improper comments by the prosecutor during her summation. For the following reasons, the

petition for a writ of habeas corpus is denied.

## BACKGROUND

      On April 19, 2002, Rosa Chan, a 56-year old woman, was mugged by two men as she was

walking home from work. One of the assailants, later identified as petitioner, snatched her

pocketbook as he rode his bike. Charles Brown, an eye-witness to these events, attempted to block

the robber's escape path, recovered the pocketbook, and chased, but ultimately lost, the assailant.

Shortly thereafter, petitioner was detained near the scene of the robbery by Detective LeEric

Hampton. There, both Ms. Chan and Mr. Brown identified petitioner at a show-up as one of the assailants and he was placed under arrest.

## A.     The Trial

Petitioner was tried before a jury on three counts of robbery in violation of N.Y. Penal Law §§ 160.10 and 160.05.[1]  The Honorable Stephen J. Rooney, of the Supreme Court, Richmond County, in Staten Island, presided over the trial, which was held from May 7, 2003 to May 13, 2003. The relevant portions of the trial evidence are summarized below.

### 1. The State's Case

The victim, Rosa Chan, testified that at about 5:00 on the afternoon of Friday, April 19, 2002, she was walking north on Mosel Avenue, in Staten Island, New York, when she saw two men with bicycles walking in her direction under the Mosel Avenue overpass.  Tr. 258:21-22, 267:9-17, 270:11-12. As she passed by the two men, who were three to four feet away, Ms. Chan was able to look at them directly. Tr. 270:24-270:1. Shortly after passing her, the two men, now riding on their bicycles, pulled up behind her; the first knocked her to the ground and the second snatched her pocketbook. Tr. 272:5-23, 273:3-13. Having had a few seconds to observe the men as she walked towards them, Ms. Chan was able to describe one of the assailants as a white male wearing a white T-shirt and knee-length camouflage pants. Tr. 270:13-17. Ms. Chan suffered minor injuries as the result of her fall and was taken to a nearby hospital. Tr. 275:11-12. About 45 to 50 minutes after the incident, Police Officer Robert Ortiz escorted Ms. Chan to the corner of McClean Avenue and Sand Lane, which was about a mile from the scene of the crime, to conduct a "show-up" of a suspect

---

[1]     Two of the counts were dismissed by the trial judge at the close of the evidence.

detained in connection with the robbery. Id. After taking two or three minutes to be sure of her identification, Ms. Chan identified him as the assailant. Tr. at 277:17-19, 278:13-25. The suspect was petitioner Robert Summa.

During cross-examination, Ms. Chan admitted that she had only a few seconds to view the two men, who were in the shadows as they passed her under the overpass, and that she did not remember the men's hair style or whether either of them had a tattoo. Tr. 284:6-7, 286:6-8. She denied describing the assailants to a police officer on that day, particularly denying that she had described one of them as wearing boots. Tr. 285:1-25. Ms. Chan was unable to make an in-court identification of petitioner as the person who robbed her. Tr. 280.

Charles Brown, the other eyewitness to the robbery, testified that he observed the robbery as he was riding in his truck on Mosel Avenue. He described the assailant who took Ms. Chan's purse as a white male with brown hair, wearing a white T-shirt and blue army fatigue pants. Tr. 342:14-25. After the assailants struck Ms. Chan and took her pocketbook, Mr. Brown intercepted the assailant carrying the pocketbook by using his truck to block the man's escape route. Tr. 348-49. The robber, still on his bicycle, swerved away but collided with another car and fell off his bicycle onto the street. Tr. 350:16-21. Mr. Brown recalled seeing blood on at least one of the assailant's elbows. Tr. 365:19-23. Mr. Brown chased the assailant for about 300 feet, finally cornering him. Tr. 351:8-17. There ensued a confrontation between the two lasting about five to ten minutes, during which, at a distance of two to three feet, Mr. Brown was able to observe the assailant closely, noticing in particular that he had numerous tattoos, including one bearing the letters "Papa" or "Pepe" on one of his upper-arms. Tr. 355:3-6. During this confrontation the two men exchanged words, argued, and physically fought. Mr. Brown hit the assailant, knocking him to the ground momentarily. Tr.

3

353:18-21. During cross-examination, Mr. Brown acknowledged that he had testified before the grand jury that the tattoo was on the assailant's left arm, Tr. 372:4-8, and he recalled the tattoo being about an inch to an inch and a half high. Tr. 373:7-11. A subsequent in-court examination of petitioner's tattoo established that petitioner had many tattoos, one of which was on the upper part of his right arm and consisted of illegible characters, approximately a half-inch in height, which did not spell either Papa or Pepe. Tr. 486:1-8, 493:1-13.

Ultimately the assailant escaped, Tr. 355:1-2, and Mr. Brown returned to assist Ms. Chan. About 45 to 50 minutes later he was taken to the show-up at the corner of McClean Avenue and Sand Lane, Tr. 355:19-25, and identified petitioner as Ms. Chan's assailant, whom he had chased and fought, Tr. 356:25-357:7. He also made an in-court identification of petitioner. Tr. 343:1-14. Mr. Brown denied having made an earlier identification of the other suspect at the Grasmere transit station, Tr. 357:20-25, although Police Officer Harris, another officer involved in the case, testified that Mr. Brown identified a man he viewed there as one of the robbers. Tr. 403:5-10.

Police Officer Richard Ortiz, the first to respond to the scene of the crime, testified that Ms. Chan had indeed described the robber to the responding officers. Specifically, he received the description of a six-foot tall white male, with short black/brown hair, wearing boots and army fatigues, and with blood on one elbow. Tr. 295:1-9. Officer Ortiz also ackownledged that during a pre-trial hearing, when queried in reference to the show-up: "[t]o the best of your recollection . . . when [Ms. Chan] was asked if she recognized anyone what exactly did she respond?", Tr. 298:1-3, he replied: "I assume that's the guy, that's it." Tr. 298:4-7. That response, he explained, "wasn't a [direct] quote . . . from Mrs. Chan", but rather testimony that Officer Ortiz "personally" assumed that "Mrs. Chan stated that this is the guy." Tr. 298:19-21.

4

Finally, Detective LeEric Hampton testified that at about 5:24 that afternoon, he saw petitioner standing by a payphone on McClean Avenue, shortly after hearing a report of the robbery. Tr. 410:10-23.[2] Because petitioner was a six-foot tall white male, wearing a white T-shirt and army fatigue pants, as well as because petitioner had a "sort of like road rash" injury on his left elbow, Detective Hampton detained petitioner. Tr. 411:5-9, 18-24. Detective Hampton testified that petitioner was wearing sneakers and that the army pants he wore were ankle-length and of gray, white and black colors. Tr. 442-443. Detective Hampton also recalled seeing the word "Papa" tattooed on petitioner's right upper-arm, Tr. 423:8-12. During cross-examination he admitted that, when approached, petitioner was not sweating, bleeding, or out of breath, Tr. 433:1-24, and that he observed nothing unusual about petitioner's manner. Tr. 432:21-25. Defense counsel also pointedly elicited that, notwithstanding Hampton's awareness that Brown had stated that the assailant had the word "Papa" tattooed on his right arm, a fact that Hampton logged in his arrest report, and despite his extensive photographing of petitioner's other tattoos on the day of the arrest, the detective inexplicably failed to take a photograph of the "Papa" tattoo. Tr. 446:24-447:21. Finally, Detective Hampton admitted that although petitioner's tattoo did not currently read "Papa", the "Papa" tattoo he observed was in the same location on petitioner's arm as the current tattoo. Tr. 450-51.

### 2. The Defense Case

The defense called two witnesses. The first, Glen Gray, testified that at 5:00 or 5:15 p.m. on a Friday in late April of 2002, on a date he could not recall, he drove petitioner from their work in

---

[2]     On cross-examination, defense counsel elicited that Detective Hampton arrived at Sand Lane and Mosel Avenue at "approximately" 5:16. Tr. 434:1-3.

Brooklyn to Sand Lane in Staten Island. Tr. 500:1-24, 502:5-11. He did not observe that petitioner was then in any way injured. Tr. 511:20-521:2. Kathy Vacca, petitioner's then-fiancee, testified that petitioner never had a tattoo that said "Papa." Rather, the tattoo characters on his right upper-arm had always spelled her name in Chinese characters. Tr. 516:1-25, 517:14-17, 519:7-11.

### 3. Summations & Charge

At the close of the evidence, the court instructed the jury that during summations the lawyers "will suggest . . . certain inferences or conclusions which they, in their opinions, believe may be properly drawn from the evidence", Tr. 575:24-576:2, but that "nothing the lawyers say in their summations is evidence in the case." Tr. 576:19-20.

*Defense Summation*[3]

At the outset of his summation, defense counsel attacked the reliability of the eye-witnesses' testimony. Although explicitly disclaiming that he was calling either of the eye-witnesses a liar, see, e.g., Tr. 578:21-23, defense counsel argued that they were "unreliable and mistaken", Tr. 578:18-19, identifying evidence which, he argued, undermined their "credibility." See, e.g., Tr. 582:25. Regarding Ms. Chan, counsel argued that she stated at the show up, "I assume that's the guy," and he reminded the jury that assumptions are not proof beyond a reasonable doubt. Tr. 579:18-21. He further argued that the two or three minutes during which she observed petitioner during the show-up "telegraph[ed] her uncertainty," which, he argued, was confirmed by her inability to make an in-court identification of petitioner as her assailant. Tr. 580:16-21. Counsel also contended that Ms. Chan's

---

[3]        Only those portions of the summations that are at issue in this case are addressed.

description of the assailant was itself unreliable because she was wrong in her statements that he wore boots and shorts, Tr. 585:8-16, and did not mention that the assailant had tattoos. Tr. 586:17-18.

Counsel then proceeded to attack Mr. Brown's credibility. He sought to undermine the certainty and accuracy of Mr. Brown's identification of petitioner by citing the conflicting testimony of Brown and Officer Harris concerning whether Brown identified the other assailant at Grasmere Station. Tr. 582. Counsel implied, notwithstanding his disclaimer of the conclusion, that, based on this discrepancy, Brown's error was not simple misidentification; rather, Brown's veracity was seriously flawed. Specifically, counsel urged the jurors "to appreciate the significance of a person that is making accusations against another of a robbery in front of the police, very serious, very serious accusation . . . against another individual and then saying it never happened. That should affect greatly your evaluation of that witness' credibility." Tr. 582:4-7, 23-25. Counsel then pursued his attack upon the reliability of Mr. Brown's identification because Brown recalled the assailant as wearing camouflage pants that were shades of blue, rather than grey, white and black, Tr. 585:21-23, and because Mr. Brown had described the assailant as injured and bleeding after his fall from his bicycle, although petitioner was not bleeding when later spotted on McClean Ave., Tr. 587:10-23. Finally, citing Brown's grand jury testimony that the "Papa" tattoo was on the assailant's left arm, counsel observed, not without some sarcasm, that, according to Brown's testimony, by the time of the trial, the tattoo had "migrated up [petitioner's] arm, across his body and over to his right shoulder." Tr. 588:23-589:10.

Finally, of relevance here, the defense argued that the testimony of Detective Hampton "sounds unbelievable" because, although he photographed some of petitioner's other tattoos and

7

despite knowing that "Mr. Brown was claiming that the robber had a Papa tattoo", Detective Hampton "just decided not to take a picture of that tattoo . . . the most crucial piece of evidence in this case." Tr. 591:9-23.[4]

### Prosecutor's Summation

In one page of argument at the outset of her twenty-page summation, the prosecutor characterized defense counsel's arguments as "smoke and mirrors." When she commenced by asking: "Did you ever see a magic show where magicians use a lot of smoke and mirrors?", Tr. 599:20-21, defense counsel objected and was overruled. Tr. 599:22-25. The prosecutor continued: "Smoke and mirrors are used to distract your eyes . . . while there's a slight of hands going on . . . The defense counsel is good at it." Tr. 600:1-5. Defense counsel again objected, and the trial judge sustained the objection with respect to "you're good" and then reminded the jury that "these summations are not evidence, as I told you, and you must not consider them as such. The lawyers are making arguments and they're asking you to draw inferences and conclusions. And as I said before, it's up to you to decide whether to adopt these inferences and conclusion in whole or in part or reject them in whole or in part and draw your own." Tr. 600:16-23. Without objection, the prosecutor proceeded: "[m]agicians only want you to look in certain places. Defense counsel is good. He has got you thinking about all kinds of irrelevant issues. Timelines, descriptions, distances,

---

[4]    In his summation, counsel also offered an alibi defense founded on Mr. Gray's testimony and various inconsistent estimates of the times of the occurrences on the day of the robbery. This argument concluded with counsel's observation that Mr. Gray "is telling the truth. He is a 56 year-old grandfather who is self-employed, who supervises Mr. Summa. He is not going to come to court and jeopardize all that by lying. He is telling you the truth. He is the independent witness in this case." Tr. 596:19-24.

8

measurements. And just like the smoke and mirrors in a magician's act, those issues catch your eye, you look at them." Tr. 600:25-601:5. When she concluded her preliminary remarks with a plea to the jury that they focus on the "quality evidence" of the two eyewitness and "not [on] the smoke and mirrors," Tr. 601:15-23, defense counsel once again objected and the trial judge instructed: "[l]et's not have any reference to the smoke and mirrors. The jury will obviously determine what evidence they believe is credible and reliable." Tr. 601:25-602:3. Later in the argument, when the prosecutor referred to some of the defense counsel's arguments as "red herrings", the trial judge sustained defense counsel's objection and instructed the prosecutor to "discuss the evidence in an objective fashion." Tr. 607:8-15.

Subsequently, the prosecutor, responding to defense counsel's attack on the reliability of the two eye-witnesses, summarized their testimony and assessed its credibility. Of Ms. Chan, the prosecutor argued that her credibility was supported by her opportunity to observe her assailant during daylight, Tr. 603:18-23, and her care in identifying petitioner during the show-up, and noted that "the fact that [Ms. Chan] didn't point [in court] to the guy who is obviously the defendant . . . should add to her credibility", Tr. 614:10-14. Turning to Charlie Brown, the prosecutor, echoing defense counsel's characterization of Mr. Brown as a "hero", Tr. 578:24, initially called him "a classic good samaritan" because of the help he provided Ms. Chan, Tr. 604:9-14. She then argued that his testimony was "quality evidence", Tr. 605:24, because Mr. Brown was "face to face with [petitioner,] [o]n a bright sunny day . . . [when] there was more than enough time for[Brown] to commit [petitioner's] face to his memory." Tr. 605:4-10. Brown "was not just a passerby who identified [petitioner] based upon his height, weight, and hair color"; "[h]e fought with this man." Tr. 605:11-14. She later referred to the eye-witness testimony and identifications of defendant as

9

"quality evidence" in the context of reminding the jury of the short time that elapsed between the incident and the identifications, and the fact that both "saw the defendant's face." Tr. 611:2-5. Responding to the suggestion that Mr. Brown's identification of petitioner was neither credible nor reliable, the prosecutor noted that Brown was a credible witness because he "stood eyeball to eyeball with [petitioner], he did battle with this defendant and he identified him as the [assailant]", Tr. 622:7-10, and had "no interest in this case, no stake in its outcome," Tr. 622:4-5.

Addressing defense counsel's argument "about Detective Hampton not taking the photograph of Papa", the prosecutor noted that Hampton "did take some photographs that are quite helpful and relevant to this case," Tr. 613:2-5, including a picture of defendant with bandage on his elbow that, she argued, was "quality evidence . . . that corroborates Detective Hampton's testimony and Charlie's testimony that the defendant had an injury on his arm on the day of the robbery." Tr. 613:10-14. Finally, in response to defense counsel's conclusions implying that the lack of a photograph of the Papa tattoo was an attempt by Detective Hampton to tailor his testimony to that of Mr. Brown, see Tr. 591:9-16, she argued that "[d]efense counsel wants you to believe there's some big conspiracy against his client. Do you honestly think Detective Hampton is going to risk his career to frame this defendant? Is it realistic to think there is a conspiracy between the D.A.'s office, the police department and Mrs. Chan? Against this guy? Officer Hampton wasn't trying to frame this guy, as defense counsel so subtly suggested to you, suspicious he didn't take the picture. If he was trying to frame him, he wouldn't have taken any pictures at all." Tr. 613:15-25.

*Relevant Portions of the Jury Charge*

After the summations, Justice Rooney charged the jury. Of relevance here, he twice instructed that the lawyers summations "are not evidence," Tr. 624:15-16, and "must not be considered [by the jury] as such." Tr. 627:15-17. He also admonished that "if the arguments of counsel strike you as reasonable . . . you may, if you so conclude, adopt them," Tr. 624:16-18, but that "if you find such arguments to be unreasonable . . . you may reject them." Tr. 624:19-21.

## B. Procedural History

Petitioner was convicted and sentenced to a determinate prison term of 10 years. Sent. Tr. 16. He timely appealed arguing that certain prosecutorial comments during summation deprived him of due process and a fair trial. As here, petitioner complained in the Appellate Division that the prosecutor (1) belittled and denigrated defense counsel's summation by her repeated references to "smoke and mirrors", "magicians", and "red herrings"; (2) mischaracterized the defense in a damaging way when she disputed the implied contention that the witnesses were part of a "big conspiracy' to 'frame' appellant," App. Br. at 22; and (3) improperly vouched for the credibility of her own witnesses.

By decision dated October 10, 2006, the Appellate Division rejected these contentions as "without merit." Citing a string of Appellate Division cases, the court quoted: "Although the prosecutor, on more than occasion during [her] summation, overstepped the bounds of proper advocacy, we conclude that, in light of the overwhelming evidence of guilty, there was no significant probability the jury would have acquitted the defendant had the errors not occurred and thus, he was not deprived thereby of a fair trial." People v. Summa, 33 A.D.3d 735 (N.Y. App. Div. 2006) (slip

op.) (citations omitted). On December 21, 2006, the New York Court of Appeals denied petitioner's application for leave to file an appeal. People v. Summa, 7 N.Y.3d 929 (2006). This timely petition followed.

## DISCUSSION

### A.  *Habeas Corpus* **Relief under AEDPA**

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, added the following provision to 28 U.S.C. § 2254 as subsection (d):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

This deferential standard of review applies only when the federal claim has been "adjudicated on the merits" by the state court, Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir.2001), which is a "substantive, rather than a procedural, resolution of a federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir.2001) (quoting Avcox v. Lytle, 196 F.3d 1174, 1178 (10th Cir.1999)). A "conclusive presumption" that the state court decision "rest[s] on the merits of the federal claim" applies to decisions that, like the Appellate Division's decision in this case, "fairly appear[] to rest primarily on federal law or to be interwoven with federal law." Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir.2006).

12

Under 28 U.S.C. § 2254(d)(1) - sometimes called the "contrary to" clause - "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under 28 U.S.C. § 2254(d)(2) - sometimes called the "unreasonable application" clause - "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Thus, in order to grant a writ there must be "some increment of incorrectness beyond error." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted). "[T]he increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id.

## B.    Petitioner's Claims Regarding the Prosecutor's Summation

As a general matter, the Supreme Court has stated that prosecutorial comments constitute a constitutional violation only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The threshold question is whether the comments were improper. This determination must be made by considering the cumulative effect of the comments as a whole, see, e.g., Floyd v. Meachum, 907 F.2d

13

347, 353 (2d Cir. 1990), in the context of the entire trial. See, e.g., Donnelly, 416 U.S. at 643; Miranda v. Bennett, 322 F.3d 171, 181 (2d Cir. 2003) ("[t]he merits of a fair trial claim will depend on the likely impact of the misconduct in light of the trial proceedings as a whole.").

If the comments at issue are improper the court must determine whether the challenged remarks "were so prejudicial that they rendered the trial in question fundamentally unfair." Floyd v. Meachum, 907 F.2d 347, 353 (1990) (quoting Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986)). "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations omitted). In collateral attacks on state court convictions, as on direct appeal, the Second Circuit applies a three-factor test in assessing whether the challenged comments created "substantial prejudice": "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." Floyd v. Meachum, 907 F.2d at 355 (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981)); accord United States v. Thomas, 377 F.3d 232, 246 (2d Cir. 2004); Bentley v. Scully, 41 F.3d 818 (2d Cir. 1994); United States v. Rivera, 22 F.3d 430, 437 (2d Cir. 1994).

As noted, petitioner here advances three challenges to the prosecutor's closing arguments. He disputes the propriety of references to certain of defense counsel's arguments as "smoke and mirrors", "a slight of hands", and "red-herrings." He protests that the prosecutor unfairly vouched for her witnesses' credibility and reliability. And he contends that the prosecutor mischaracterized the defense's attack upon the State's case as implying the existence of a "conspiracy" to "frame" petitioner.

14

**1. Whether the remarks were improper**

As a threshold matter, it is doubtful that the remarks complained of were even improper. Certainly, the prosecutor's rhetorical references to "magicians", "smoke and mirrors", and "red herrings" are far from the type of comments "designed to appeal to the jury's emotions or to 'inflame the passions or prejudices of the jury'", United States v. Peterson, 808 F.2d 969, 977 (2d Cir. 1987) (quoting American Bar Association Standard 3-5.8(c)), and are not comparable to those found to be "clearly improper" by courts in this circuit, see, e.g., Hirsch v. Plescia, No. 03-CV-1617 (DLI), 2005 WL 2038587, at *6 (E.D.N.Y. Aug. 23, 2005) (comments that petitioner was a "sadistic" "animal" were improper). To the contrary, though these statements may have been "blunt and to the point, [this] alone is not a basis to find them improper." United States v. Simmons, 923 F.2d 934, 955 (2d Cir. 1991). Importantly, these remarks were not improper when viewed in the context of the entire trial because they were not excessive, but were rather rhetorical devices limited to initial remarks prefacing the prosecutor's response to defense counsel's attack on the credibility and reliability of the eye-witnesses. Cf. Peterson, 808 F.2d at 977 ("[u]se of the words "liar" and "lie" to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory.").

Nor was it improper "vouching" for the prosecutor to argue that, because both eye-witnesses had sufficient opportunity to observe the assailant and Mr. Brown "had no stake in [the] outcome" of the case, Tr. 622:4-5, the eye-witnesses offered credible, "quality evidence", Tr. 605:24. Such comments are not improper because they merely responded to defense counsel's strategy of relying on arguably immaterial inconsistencies in the testimony in contending that the witnesses were "unreliable" and their "credibility" in doubt. See, e.g., Brunson v. Tracy, 378 F.Supp.2d 100, 108

15

(E.D.N.Y. 2005) ("prosecutor's attempt to rehabilitate the credibility of the victim [and the police officer was] responsive to defense counsel's closing argument . . . attacking [their] credibility" and thus not improper) (citing Young, 470 U.S. at 12-13); see also Rivera, 22 F.3d at 438 ("[i]n light of the defense summation [attacking credibility of main government witness] the government's rebuttal was not impermissible"); Simmons, 923 F.3d at 955 ("[w]hen the defense counsel have attacked the prosecutor's credibility ... the prosecutor is entitled to reply with rebutting language suitable to the occasion.").

Finally, the prosecutor's characterization of the defense's attack upon the State's case as involving a "frame" or "conspiracy" was not improper. The Second Circuit has noted that "when the defense has 'attacked the . . . credibility of the government agents," as defense counsel did here by arguing that it "sounded unbelievable" that Detective Hampton had not taken a picture of the "Papa" tattoo, "the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994). Moreover, defense counsel's pointed question of Detective Hampton and his comments on that testimony during summation can fairly be read to imply that the defense was attacking the State's case as designed to "frame" his client, despite defense counsel's disclaimer of such a theory. Having established on cross-examination that petitioner did not, on the day of the trial, have a "Papa" tattoo, defense counsel engaged in the following exchange with Detective Hampton during cross-examination:

> "[Defense counsel] Q. [D]id you make accurate entries in [the online booking system worksheet report]?
> [Det. Hampton] A. Yes.
> Q. And you noted Mr. Summa's tattoos in there, right?
> A. Yes.
> Q. And you noted that he had a Papa tattoo?
> A. Yes.

16

* * *

Q. And you wrote Papa because you thought you saw Papa?
A. Yes

* * *

Q. And you knew the complainant was claiming that my client had that tattoo?
A. Yes.
Q. Did you take a picture of that tattoo?
A. No.
Q. Why not?

* * *

Q. [Y]ou got a picture of the tiger [tattoo], right?
A. Yes.
Q. You got a picture of the spider web [tattoo], right?
A. Yes.
Q. And you did not take a picture of the Papa tattoo, right?
A. Right.
Q. Did you run out of film?
A. No.

* * *

Q. At the time when these pictures were taken, you knew that the witness was indicating that there was a Papa tattoo, right?
A. Yes.
Q. And no picture of it, right?
A. No."

Tr. 446:18-447:22, 454:6-455:10.

During summation, referring to Hampton's failure to photograph the "Papa" tattoo on the day of petitioner's arrest, defense counsel argued: "[Detective Hampton] leaves out a photograph of the crucial evidence in this case? You decide what you believe. I think it sounds unbelievable. But you decide." Tr. 591:21-23. Read in the context of the entire trial, this argument implies not mere

17

mistake, but intentional falsehood, suggesting that the detective contrived to incriminate an innocent man. The prosecutor's characterization of defense counsel's argument as implying that the State had "framed" his client was invited by defense comments and was not improper.

### 2. Whether the remarks were prejudicial

Even assuming *arguendo* that the challenged remarks, either singly or in combination, were impermissible, they do not approach the level of prejudice required to entitle petitioner to the relief he seeks.

#### a. The severity of the misconduct

The "severity of the misconduct" is the first factor in assessing whether the prosecutor's comments created "substantial prejudice." Preliminarily, for the same reasons related above supporting the propriety of these comments, it cannot be said that they were so gravely improper as to have substantially prejudiced petitioner.

Moreover, "the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." United States v. Elias, 285 F.3d 183, 191 (2d Cir. 2002). Here the only improprieties asserted concerned the prosecutor's summation. "[T]he opening statement and the prosecutor's conduct throughout the rest of the trial is unchallenged." United States v. Thomas, 377 F.3d 232, 245 (2d Cir. 2004).

Turning to the prosecutor's asserted vouching for the eye-witnesses by calling their testimony "quality evidence" or "credible", these references were not prejudicial because a prosecutor is afforded more latitude when comments relate to the credibility of witnesses and are grounded in the evidence in the case. See, e.g., United States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002)

(prosecutor's comments that the defendant's testimony "made no sense", was "a slideshow", and that the defendant's expert's testimony was "built on a foundation of sand" not prejudicial because "they all concerned witness veracity"). As noted above, the prosecutor simply outlined, based on the testimony of each witness, the opportunity each had to observe the defendant and to "commit his face to . . . memory," <u>see</u> Tr. 602-605, thus making each "a credible witness", <u>see, e.g.,</u> Tr. 603:18. To that extent, the comments "do not come within hailing distance of prejudice," <u>Coriaty</u>, 300 F.3d at 255, particularly because the prosecutor did not make an issue of her own credibility, but merely of the credibility of the eye-witnesses. <u>Compare</u> <u>Rivera</u>, 22 F.3d at 437-38 (noting that "prosecutors should avoid frequent use of rhetorical statements puncutated with excessive use of the personal pronoun 'I' [because] such phrasing [inappropriately] make[s] an issue of [the prosecutor's] own credibility") (citations omitted).

Moreover, courts have repeatedly held that even a prosecutor's arguments that "vouch" for the credibility a witness are not normally prejudicial when they occurs, as in this case, in response to defense counsel's attack upon the witness's credibility, <u>see, e.g.,</u> <u>Vega v. Fischer</u>, 463 F.Supp.2d 470, 476 (S.D.N.Y. 2006); <u>Louis v. Fischer</u>, No. 04-CV-2887 (NGG), 2007 WL 4198255, at *16 (E.D.N.Y. June 25, 2007) ("[e]ven though it was improper for the prosecutor to refer to [the witness's] grand jury testimony, [the comments] were made in response to defense counsel's argument that [the witness] had fabricated her grand jury testimony"); <u>Suriel v. Burge</u>, No. 04-CV-3451 (SLT), 2006 WL 2583203, at *7 (E.D.N.Y. Sept. 6, 2006); <u>see generally</u> <u>Darden</u>, 477 U.S. at 182 (explaining the use of the "invited response" concept in analyzing the gravity of prosecutorial misconduct) (citing <u>Young</u>, 470 U.S. at 12-13).

Finally, regarding the reference to the defense theory of the prosecution as a "frame-up", such characterization is not prejudicial, even if not wholly accurate, when it is invited by defense counsel's arguments and implications regarding the flaws in the government's case. In Vega v. Fischer, 463 F.Supp.2d 470 (S.D.N.Y. 2006), the petitioner was convicted of robbery partly upon the eye-witness testimony of the victim, who also picked him out at a lineup that defense counsel labeled "suggestive" and "tainted." Vega, 463 F.Supp.2d at 476. The prosecutor argued to the jury that "the defense wants you to believe that [the petitioner] was framed" and the district court noted that, although this "characterization of petitioner's defense was hyperbole, [it] was a fair response to defense counsel's attempts to undermine the credibility of the prosecution's witnesses." Id. See also United States v. Preatorius, 622 F.2d 1054, 1061 (2d Cir. 1979) (in a trial where "there were numerous instances of the defendants' attorneys suggesting that the prosecution was engaging in some sort of "frame up," . . . this rendered quite proper the relatively mild response by the [prosecutor].").

Thus it cannot be said that any of the challenged remarks, even if considered improper, rise to the level of gravity that engenders prejudice.


### b. Curative measures adopted by the trial court

The trial court also gave adequate curative instructions that mitigated any potential prejudice that may have stemmed from the prosecutor's comments. As noted, the court instructed the jury, both before summation and on two occasions thereafter, that the comments made by the lawyers were not evidence and should not be considered as such, and repeatedly noted that all determinations of truthfulness were a matter for the jury to decide. Tr. 575:24-576:2, 576:19-20, 627:15-17, 624:16-

21. Moreover, when defense counsel objected to the prosecutor's use of the phrase "smoke and mirrors," the court once again repeated its admonition that summations were not evidence. Tr. 600:16-23. All of these instructions "lessened the blow" that may have been caused by the prosecutor's comments. See Hirsch, 2005 WL 2038587 at *7; see also Darden, 477 U.S. at 182 (noting that "court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence"); United States v. Thomas, 377 F.3d 232, 245 (2d Cir. 2004) (immediate curative instruction was appropriate because it was "detailed and clarified that any determination of a witness's credibility was within the province of the jury" and was coupled with instruction "at the end of the trial that statements made by the lawyers during the trial were not evidence"). Finally, the trial court can hardly be faulted for not giving specific curative instructions with respect to the prosecutor's rehabilitation of her witnesses, or with respect to the mentions of "frame" and "conspiracy", given that defense counsel did not object to those comments at trial. Cf. Rivera, 22 F.3d at 437 ("[i]f the defendant failed to make timely objection to a statement contained in the prosecutor's summation, the statement will not be deemed a ground for reversal unless it amounts to a flagrant abuse") (citations omitted).

### c. Strength of the evidence against petitioner

Finally, because the evidence of petitioner's guilt was persuasive, the court certainly cannot say that the Appellate Division's determination of the strength of that evidence was unreasonable. To prevail, petitioner "must demonstrate that, absent the misconduct, he would not have been convicted." Thomas, 377 F.3d at 245. This he cannot do. As detailed above, the State presented the testimony of two eye-witnesses, Ms. Chan and Mr. Brown, both of whom identified petitioner

21

as the robber less than an hour after the crime had taken place, after providing detailed descriptions of the assailant that generally fit petitioner. Ms. Chan's identification was supported by her opportunity to observe her assailant from within a few feet as she walked towards and passed by him on the street during daylight. And Mr. Brown's identification of petitioner rested on an especially strong foundation. During an intense confrontation between the two, lasting more than fifteen minutes, involving Brown's witnessing of the crime from close distance, a chase, an exchange of words, and a lengthy physical confrontation during which the two remained within a few feet of each other, Brown had ample opportunity to study closely petitioner's facial features, physical characteristics, and clothing. Moreover, Detective Hampton spotted petitioner in the vicinity of the crime shortly after it was committed, matching physical characteristics and wearing clothing similar to that which the eye-witnesses had described. Because there was strong evidence of guilt, it is improbable that the prosecutor's isolated comments complained of here, even if marginally improper, could have had any impact on the outcome of the trial. Therefore, petitioner cannot establish that he suffered substantial prejudice warranting habeas relief.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is denied. No certificate of appealability is granted as this petitioner presents no "substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253. The petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See id. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

/S/
_____
Allyne R. Ross
United States District Judge

Dated: April 18, 2008
Brooklyn, New York

SERVICE LIST:

**Pro Se Petitioner**

Robert Summa
03A3182
Washington Correctional Facility
P.O. Box 180
72 Lock 11 Lane
Comstock, New York
12821-0180

**Attorney for Respondent**

Lauren-Brooke Eisen
Richmond County District Attorney's Office
130 Stuyvesant Place
Staten Island, NY 10301